## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 19 2017, 10:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel C. Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Damian M. Coleman, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | December 19, 2017 <br><br> Court of Appeals Case No. <br> 30A01-1705-CR-1034 <br><br> Appeal from the Hancock Circuit Court <br><br> The Honorable Richard D. Culver, Judge <br><br> Trial Court Cause No. <br> 30C01-1603-MR-411 |

**Crone, Judge.**

## Case Summary

[1] Damian M. Coleman appeals his felony murder conviction, asserting that the evidence is insufficient to support it. Concluding that the evidence is sufficient, we affirm.

## Facts and Procedural History

[2] The evidence most favorable to the verdict shows that in March 2016, Shannon Kitchens was at his Fortville home with Shawn Hammons. The men wanted to cash Kitchens's $14,000 disability check and buy crack cocaine. They began texting and calling Coleman, from whom they had previously bought drugs, to set up a drug deal. In the early afternoon, Hammons drove Kitchens in Hammons's black Ford Explorer to a Check 'n Go on Pendleton Pike. Kitchens went in to cash his check, and Hammons waited in his car and finalized the drug deal with Coleman. Because Coleman owed Kitchens money, Coleman agreed to sell nine grams of crack cocaine for a reduced price of $300, and agreed to meet them in the parking lot. When Coleman arrived, he and Hammons took some Adderall, and Hammons drank some beer and whiskey. Kitchens joined them to smoke cocaine while his check was being processed.

[3] Around 5:00 p.m., Kitchens got his money and returned to Hammons's vehicle with $3000 in cash. He got in the front passenger seat, and Hammons parked at the end of the parking lot. As Kitchens was counting his money, Coleman, who was in the back seat, pointed a handgun at him and demanded all the

money. Kitchens tried to grab the gun. As they wrestled over possession of the gun, Coleman shot Kitchens. Coleman put his hands up in shock, releasing the gun. Kitchens threw the gun out the passenger window, grabbed his side, and said, "Oh my God." Tr. Vol. 2 at 215. Kitchens died almost immediately. Hammons started driving, and Coleman opened his door and jumped out of the car.

[4] Hammons was "scared out of [his] mind." *Id*. at 217. He turned east on Pendleton Pike and "never let off the gas." *Id*. Eventually, he found himself on 46th Street, reaching speeds of seventy or eighty miles an hour. He kept looking over at Kitchens and saw "this dead stare of the dead." *Id*. He had "never seen anybody shot let alone die." *Id*. He stopped on the side of the road, pulled Kitchens out through the window (the door handle was missing), and placed him on the ground beside the vehicle. Hammons was still high and scared, so he got back into his car and started driving. Hammons noticed a gun magazine and Kitchens's cell phone on the passenger seat, and he threw them out the window. *Id*. at 221. At approximately 5:35 p.m., Kitchens's body was noticed by passing drivers, and the police were called. The police identified Kitchens, observed that he had been shot, and began investigating his death.

[5] Meanwhile, Hammons arrived at the Fortville home of his ex-girlfriend, Carol Skaggs. He parked his car in her driveway, picked up Kitchens's money from the front floorboard, and put it in his wallet. Hammons told Skaggs what happened and asked her to drive him to his girlfriend's house in Anderson. She agreed. Hammons left his vehicle in Skaggs's driveway, and Skaggs and her

boyfriend drove Hammons to Anderson. However, Hammons's girlfriend, Amber Faulk, was not home, the door was locked, and Hammons did not have a key. Hammons called her from a neighbor's, she drove back to her house, and she and Hammons went inside. Hammons started coming down off his drug high and knew that he was going to be in trouble for pulling Kitchens out of the car.

[6] After a couple hours, Hammons received a call informing him that the police were on their way to Faulk's house. He went outside to wait for them. When the police arrived, Hammons approached them and stated that they probably wanted to talk to him. He told the police that a scuffle had occurred and that Kitchens had been shot. He also told the police that Kitchens's money was in Hammons's wallet in a kitchen cabinet inside Faulk's house. After the police retrieved the money, they took Hammons to the police department. They read him his rights, and he agreed to talk to them. Police found the gun magazine and Kitchens's cell phone on the side of the road where Hammons told them he had thrown them. Police also found a spent shell casing in the back seat of Hammons's car.

[7] That evening, Coleman called his friend Ronald Monday and told him that he had set up a robbery with Hammons that did not go as planned. Tr. Vol. 3 at 200-01. Coleman also told Monday that he had jumped out of Hammons's car and been dragged a short distance.

[8] The State charged Coleman with Count I, felony murder while committing or attempting to commit robbery; Count II, felony murder while committing or attempting to commit dealing in cocaine; Count III, level 3 felony attempted robbery; Count IV, level 3 felony conspiracy to commit robbery; Count V, level 3 felony attempted dealing in cocaine; and Count VI, level 3 felony conspiracy to commit dealing in cocaine. The State also charged Coleman with being an habitual offender. The State subsequently dismissed Count IV. A jury found Coleman guilty as charged. The trial court entered judgments of conviction on Counts I, V, and VI and sentenced Coleman to an aggregate sentence of eighty-three years. This appeal ensued.

## Discussion and Decision

[9] Coleman challenges the sufficiency of the evidence supporting his felony murder conviction. In reviewing a claim of insufficient evidence, we do not reweigh the evidence or judge the credibility of witnesses, and we consider only the evidence that supports the verdict and the reasonable inferences arising therefrom. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." *Id*.

[10] To convict Coleman of felony murder as charged in Count I, the State was required to prove beyond a reasonable doubt that he knowingly killed Kitchens while committing or attempting to commit robbery. Ind. Code § 35-42-1-1(2); Appellant's App. Vol. 2 at 39. The State presented evidence through Hammons

that Coleman pointed a gun at Kitchens, demanded his money, and shot him as they struggled over the gun. Also, Coleman was sitting in the back seat of Hammons's car, and the police found a spent shell casing in the back seat. Coleman argues that, in addition to Hammons's severe credibility deficiencies, Hammons's version of events is "implausible, if not impossible" and is unsupported by probative evidence. Appellant's Br. at 17. Coleman points out unrealistic aspects of Hammons's story and identifies inconsistencies between his testimony and that of other witnesses. However, it "'is precisely within the domain of the trier of fact to sift through conflicting accounts of events. Not only must the fact-finder determine whom to believe, but also what portions of conflicting testimony to believe.'" *Atwood v. State*, 905 N.E.2d 479, 484 (Ind. Ct. App. 2009) (quoting *In re J.L.T.*, 712 N.E.2d 7, 11 (Ind. Ct. App. 1999)), *trans. denied*. Coleman's argument is merely an invitation to judge witness credibility and reweigh evidence, which we must decline. Accordingly, we affirm his conviction.

[11] Affirmed.

Robb, J., and Bradford, J., concur.